Let me ask, my understanding, you start the clock, my understanding is that your client was released a few days ago, is that correct? That's my understanding, your honor. She was at the halfway house and my understanding is that she was recently released. All right. She's still in supervised release though for three years. Right. Thank you. A society where discrimination and gender profiling is nonexistent, where the laws protect the people, where the members of the body entrusted to enforce the laws are just, fair, impartial, and observe the same laws. That is the dream. Discrimination and gender profiling is a disease that we must exterminate. We are in a society where women have been endorsed in the military, in the workforce, as agents, as drivers, as judges. I appreciate those aspirations, but what does that have to do with this case? Gender or male, it can be quite relevant in a non-discriminatory way, obviously. What you have here, as I understand these facts, is the oddity to the border of having a sedan come through with a single female driver followed abruptly thereafter with the same phenomenon, another sedan suddenly with a single female driver, then another sedan with a single female driver. Now, that has, on the border, that's a powerful signal. What is impermissible in terms of you're suggesting that because that raised arguably suspicion, and it plainly did, that there's something gender-based in a prohibitive way about that use of it? Well, Your Honor, in this case, one of the things that's very significant is that in Government Exhibit C, it's the video of the checkpoint. In testimony, the agent, Montero, has admitted that there is a Ford vehicle that approaches, which is a sedan, and that vehicle, he describes that the driver is a male, and with question about what he did in reference to that vehicle, he said, I don't know, he could have been also involved, but who knows? That was his response, basically. So here we have this male driver in a Ford sedan, and he's treated differently than the three female drivers who crossed through the checkpoint before. Now, the fact that there was three vehicles with female drivers driving through the checkpoint, that doesn't make any connection with Vehicle 3, where they found undocumented people. They still had to make a connection to go and look for Mackie and the other vehicle, who had already passed through the checkpoint, and the officer couldn't articulate. Well, one of the phenomena of border is the usage of sometimes a cover with using females with children to smuggle drugs. I'm saying that the border relies upon, to a certain extent, inevitably, a certain amount of profiling based on their own experience and history of drug interceptions and other impermissible items. That's the way the border operates. Yeah, but we have cases, for example, in Rangel v. Fortillo, out of this court, where the court stated that proximity to the border was not by itself a factor that can be considered. Now, in that case, Rangel v. Fortillo, the court took into consideration numerous factors to address the reasonable suspicion. For example, where the vehicle was stopped, there were 500 yards from the border. There were two vehicles who were seen by the officer exiting a Walmart, so the officer said these vehicles were driving in tandem. The officer also pointed to the fact that the passengers in the vehicle he stopped had no shopping bags, so he thought that would be suspicious. They identified this Walmart parking lot as an area very common for alien transporting activities, and yet the court stated that these were not factors that amounted to reasonable suspicion. Let me ask you, is it your position that there were not enough additional factors besides the fact that there were three sedans at a very late hour, all driven by women? There were not enough additional factors? Are you saying regardless of how many additional factors there may have been, it would be impermissible even to consider that there were women driving each of those sedans as a common element that makes the whole pattern suspicious? For the reasonable suspicion argument for the motion to suppress, Your Honor, my position is that the factors that the agents pointed out throughout their testimony are nonsense. As a matter of fact, the district court— Well, let me ask you, though, just as a yes or no, is it impermissible to have as one of those factors the coincidence of each vehicle, similar vehicle, being driven by women, and then add some other factors to it? Are you saying that has to be ignored, even though in the officer's experience that is unusual, and then tie it to other factors as well? Must that be ignored, in your view? Your Honor, I don't—my position is that it is not sufficient to give reasonable suspicion to the officer. The fact that there's three women driving through the checkpoint one after the other is not enough to say you must be involved in criminal activity just because you happened to drive right before someone who did have aliens in their trunk. Well, if you look at the videos, all of a sudden there's a sedan that comes up that's driving a female, and then there's another female coming up in the sedan, and this is at a time when there's nothing out there but trucks at this thing. And then it's bing, bing, bing. And suddenly on the third one, the light goes off, and so they look in the trunk. And, of course, each one of them had a male there. And so it's not just females. It is the type of vehicle and the sequencing of which that occurred at a checkpoint. But, Your Honor, the type of vehicle, I don't believe that it should be something that should be considered. For example, I would agree if, let's say, all three vehicles were raced to the same person, but there's no such thing here. And the agents actually looked at the license plates before they went so they could go and try to find those vehicles, but there's no connection. I mean, driving a sedan is probably more likely. I'm sorry. There's one other detail. They were all about the same age, their 20s. But maybe these people could be coming from a party. You know, we have things that innocent people may be doing, just like in the Hell Portillo. Any factor, factor, factor. The problem, though, is there may be innocent explanations, of course, but all they need is suspicion. They don't need probable cause or certainty. What do you make of the fact that it was also during a shift change, correct, around the 1 o'clock shift change, which the officers say that smugglers know when that's happening, and they try to go through when the agents aren't as focused on the road. And as to that, Your Honor, when the agent was questioning, well, what would be normal traffic at that time, and he ends up saying about five vehicles in five minutes. And when we look at the video and look at the timing, that's what we had. So there was nothing unusual about the traffic at the time of the shift change. Now, there's also cases out of the Fifth Circuit who have declined to give way to the fact that a vehicle was driving through the checkpoint at the time of a shift change, and they had other factors as well, and they decided that it was not enough to amount to reason. Here there's a big factor, which is the third car had a person hidden in the trunk. I mean, I guess I have a little bit of a hard time saying they're targeting these people in a discriminatory manner because they're women when they let the first two through. They did a basic inspection. They let them through. It's only when they see the third car where I think the trunk was low, so they asked for consent to search. There it is. There's someone in the trunk. That's when they then go after the first two cars. But that's a significant fact that the third car has someone hidden in it. But then I'm troubled by the fact that there's a Ford sedan right behind them who arrives within seconds, and the agent says, well, I don't know. He may have been involved. Who knows? So he didn't even bother in checking me. Instead of saying, okay, let me check this vehicle, which is right here, he sent someone to go look for the other two vehicles, and he never bothers with the same description of the vehicle to look into whether that person is involved. For all we know, that person could have been the agent smuggler who sent the women, and he's supervising that they're going through. But the agent decided not to do that, and that's part of our argument to the gender profiling and the violation of the due process rights. I thought the third one told the agent that she was following the other two. Your Honor, that was the basis of our motion to suppress because that was what was in the reports. The agent submitted a strong statement saying this is why these people were detained. We filed our motion to suppress based on this is not enough to just someone says those two cars in front of me had aliens. However, at the time of the hearing, that's when we find out that the agents are saying, well, no, no, no. When we stopped Mackie and the other vehicle that had already passed through, we did not have the information from Vehicle 3 that she was driving with the other two. We stopped them before we had that information. So this is where all this gender profiling actually arose. At the time of the suppression hearing, when we found from the agent what exactly happened and when he said, well, I became highly suspicious because it was three female drivers. But what about the government says inevitable discovery? I mean, I think they agree with your sequence. They hadn't called ahead to Lopez and said, oh, she said the others are carrying people in the trunk, too. But they say inevitable discovery because within just a few minutes that would have been radioed ahead and then they would have certainly had a basis to stop them on that ground. Your Honor, I think that using inevitable discovery is too much of a stretch because that will have just given more time for Vehicle 1 and 2, which Mackie was Vehicle 2, to get ahead on the road. And agents wouldn't have been looking for them that fast. So I think that trying to apply the inevitable discovery will be just too far of a stretch to say, well, it could have happened. But I don't think it's a certainty that it will have been discovered, no matter what. All right, counsel.  Yes, Your Honor. I would like the court to consider that the case cited by the government, which is Bender, one of the cases where they used to say that it's enough to consider that the vehicles were driving in tandem. In that case, there was more factor. For example, it's two vehicles driving through the checkpoint. The vehicles had sent marijuana. There was a CB radio transmission, and this CB radio transmission was in Channel 6, a channel that was not usual for this area. In addition, the agent, when questioning the drivers of each vehicle, found out that both vehicles were going to El Campo, Texas. That's a small town out of Houston, and that town is about 183 miles from that checkpoint. So here we have different factors that connect the vehicles so that we can say, okay, the vehicles are probably driving in tandem. We have reasonable suspicion to stop them. Other than that, in Mackey, we don't have any factors just like that. The agent didn't know where these cars were coming from. The agent didn't know the cars were going to the same place. You know, we'll ask the court to reverse this case and hold that Mackey due process rights were violated, that the agent's behavior constituted gender profiling, and consequently the conviction should be vacated and the district court should dismiss with prejudice. In the alternative, we ask the court to reverse this case and hold that the agent had no reasonable suspicion to stop Mackey. Thus, her Fourth Amendment rights were violated, and such governmental behavior merits the motion to suppress, be granted, and exclusionary rule be applied to deter this kind of law enforcement behavior, Your Honor. It's one of the important things in this case is that the agents are using this dress code word. Like, there's a dress code to go through the checkpoint. At some point, they described that the women were being used to distract them, like if there were no female agents at the checkpoint. And the danger of this, Your Honor, is that even the prosecutor used the word that the females were provocatively dressed. The agent denied using those words, but when asked, well, what do you mean by dress code, he couldn't articulate anything that was unusual about this clothing. We have Mackey wearing leggings and a tanta when we are in South Texas in June 2016. The temperatures in June rise to over 100 degrees. Well, maybe not at midnight. I'm sorry? Maybe not at midnight. Maybe about 90, but still warm. And if you've been in Laredo, Texas, Your Honor, sometimes at night you can feel the warm air. But it's nothing unusual about the clothing to go through the checkpoint. Now, the danger of using provocatively dressed to describe these defendants is that these are phrases that are used to excuse or to blame women when they're sexually harassed, when they're sexually abused. And they're using these words to somehow blame women for men's improper behavior and illegal behavior. And we have to put a stop to that. We cannot have government using provocatively dressed to describe defendants, Your Honor. All right, Counselor, you have time for rebuttal. Good morning, Your Honors, and may it please the Court. Ross Goldman for the United States. Ms. Mackey relies on her gender profiling claim both in support of her Fourth Amendment claim and in support of her Equal Protection Selective Enforcement claim. I think it's very important, as this Court considers those claims, that they must be treated separately for purposes of addressing the gender profiling claim. In the Fourth Amendment context, it is very clear after the Supreme Court's decision in Wren that the subjective motivations of officers are irrelevant, that the Court will not look behind an objectively reasonable traffic stop to inquire about the subjective motivations of the officers. In this case, on the Fourth Amendment side, there are a number of factors that support the District Court's conclusion that the stop was supported by reasonable suspicion. First, and I think most importantly, is the fact that the agents found suspected illegal aliens hiding in Ms. Flores's car. And the agents had a reasonable basis to assume that Ms. Mackey was riding in tandem with Ms. Flores. And that combination of finding the contraband in one car with a suspicion of riding in tandem for the other car goes all the way toward providing reasonable suspicion for the stop of Ms. Mackey's car here. That's especially true when you layer on top of that the fact that the stop occurred approximate to the border, that the women passed through the checkpoint at a shift change time, and that Highway 83, as the agents testified, is a known alien smuggling route. And so I think the District Court was on very solid ground in upholding the stop under the Fourth Amendment. On the selective enforcement side, to be sure, an officer's subjective motivations may be relevant. But there is a framework for deciding these kinds of equal protection selective enforcement claims. And I think the easiest way for this court to resolve the claim in this case is to analyze it the way the District Court did, which is to say Ms. Mackey had the burden of coming forward with clear evidence that the agents were motivated by a discriminatory purpose and that their conduct had a discriminatory effect. Discriminatory effect meaning that similarly situated people, in this case of a different gender, would not have been stopped. At no point in this litigation has Ms. Mackey ever tried to discharge her burden, which the Supreme Court has described as both rigorous and demanding. She didn't try to discharge that burden before the magistrate judge. When she lost on that ground in the magistrate judge, she didn't try to discharge that burden in the District Court. And when she lost on that ground in the District Court, she hasn't tried to fulfill her burden in this court. I think that's the most straightforward way of resolving Ms. Mackey's selective enforcement claim. As we say in our brief, I think there's a very fair question on the discriminatory purpose. I should say a very fair inference that there was no discriminatory purpose here. And I think the best evidence of that is that the checkpoint agent cleared Ms. Trevino and then Ms. Mackey through the checkpoint in a matter of seconds and only searched Ms. Flores' car after noticing that it was sagging low. I think that hardly bespeaks a purpose to discriminate on the basis of gender. It looks to me like all these equal protection cases that I've seen are raced. Are there other gender claims in the criminal context? So, Your Honor, I haven't seen gender claims. I haven't seen them in the criminal context. I haven't really seen them in the Section 1983 sort of civil damages context. We take the point, though, that, you know, just as race is a protected characteristic under the Equal Protection Clause, that gender would be sort of fall within the Armstrong framework. But I have not seen claims that turn on. I mean, they're both protected, but gender is less protected. Gender is subject to only intermediate scrutiny. That's right, Your Honor. On the First Amendment point, oh, well, I should say one word just briefly about inevitable discovery just to correct one thing. The government doesn't have to show, as my friend said, that the evidence certainly would have been discovered. The standard is a reasonable probability, not certainty. And how does the timing work on that? Remind me, when was the call ahead? When was discovery made? So the discovery—well, so we don't know exactly when Ms. Flores told the checkpoint agent that she was traveling in tandem with the first two cars. What we do know is that Agent Lopez, who is the agent who stopped Ms. Mackey, heard the radio transmission, in his words, quote, just after finding the suspected legal aliens in Ms. Mackey's trunk. And so that's the timing piece that we do affirmatively know from the record. At the beginning, you said, you know, they find the aliens in the trunk of the third car, and that that discovery, plus having a basis to believe the three cars were working in tandem, gives reasonable suspicion to stop the other two. I think that's clear under our case law. What factors would you point to, what facts give support for finding that they were in tandem? So I think the district court had it right, and the district court pointed to the following facts. One, that these three cars came through the checkpoint, basically one right after the other. No cars came to the checkpoint in between them, and that all three cars were sedans, which the court noted, referencing, and there were four agents who testified, and they all testified to this, that at 1 o'clock in the morning at this checkpoint, seeing sedans come through, and especially sedans with single individuals inside, is highly unusual. That the vast majority of traffic are oil rigs, commercial traffic, sometimes school buses or families coming home from sporting events. The district court didn't rely on gender at all in formulating reasonable suspicion for the stop, but I think the district court had that analysis correct, Your Honor. A word on the First Amendment claim, since it came up with respect to the dress code, I think it's very clear from the record, and both the magistrate judge and the district court came to this conclusion, that although Agent Monte Rojas used the formulation dress code, he was in no way suggesting that there was, in fact, a set of clothes that someone is required to wear and that they're subject to some kind of suspicion if they don't meet some predetermined standard. He says that it's just that they were different, the clothes were atypical or unusual. That's what Agent Monte Rojas said. It actually doesn't matter in this case, because the magistrate judge made no finding of fact with respect to whether the clothes were atypical or unusual, and didn't rely on that testimony at all in rejecting any of these claims. Nor did the district court rely on this testimony at all, nor have we relied on this testimony at all. So I think the First Amendment claim in that respect rests on a misinterpretation, an overstatement of the record. It also really has no bearing on this case, and we've outlined other reasons in our brief why Ms. Mackey's First Amendment claim fails. Most notably, she has established that the First Amendment applies to her dress that night, and that it is not a First Amendment violation to consider someone's clothing in the reasonable suspicion calculus. As a final point that I want to make, my friend on the other side has referenced this fourth car that was at the checkpoint. There does appear to be a fourth car. It does appear to be a sedan. I may be mistaken about this, but I am quite confident that there is nothing in the record that discloses whether the driver of that car was a male or a female. But what the record does show is that Agent Monte Rojas said he doesn't know if that fourth car was involved in this or not, but again, by that time, they had stopped Ms. Flores, they had found the illegal, suspected illegal alien in her trunk, they had brought her into the checkpoint station, they drove her car off to the side. There's just no evidence in the record at all with respect to that fourth vehicle, other than the fact that it was there and that it looks like it was a sedan. With that, I'm happy to answer any questions that the Court may have on any of these claims.  Thank you, Counselor. As to the fourth driver being a he, that's at 345 and 346 of the record. It's clear in 345, 346 that it's a male. It's also clear that the driver is a sedan. It's also very clear that the agent paid absolutely no attention and could not describe anything about that fourth sedan because he completely ignored it because it was a male. As to the argument right now about equal protection, I think J.E.B. v. Alabama is the best case that we have. And the reason that J.E.B. is important is because it's like this case. Here, what we have is we have the agent saying how important a factor them being female was. It's repeated. It's the whole theme of the prosecution at the motion to suppress, even though now it's being played down. That was their theme. And in J.E.B., what you have is you have the State striking all of the male jurors because they don't believe – and it's in a paternity case because they don't believe that males can be fair in a paternity case to the female. And the court – and that's what we have here. We have a case where the agents, through their testimony, repeatedly use words like females are used to distract. They use it at 336, again at 336, at 339, at 362, at 371. And then they repeatedly say that they became highly suspicious because it was three female drivers. And so as to our motion to dismiss for due process, J.E.B. is what gives us the best case that describes a situation like this because what counsel is talking about right now are cases that involve a defendant having to prove that there was discrimination. Here we don't have to prove it. The agents themselves, through their words, they said it. They said it. The prosecutor said it. And that's different from the cases that they've cited. In those cases, you had – they're mostly civil cases in the context of a plaintiff trying – in a 1983 case trying to get discovery and they're making an allegation that there was some sort of profiling, but they don't have any admission from the government about it. Here we do have that, and that's what makes our case different from all of those cases. We like the court to look at the different factors as well. When we go back to the Fourth Amendment claim, we go back to the Fourth Amendment claim. They describe several factors, but when you look at the factors, the factors are all nonsensical. If you look at Agent Monterroja's – his testimony, because throughout his testimony he goes back to clothing, women being used to distract agents, which presumes that all the agents are men and that they would somehow be distracted by women and that this is something that he's seen maybe once, that he thinks that this is something that alien smugglers do. They send women. He had nothing to back that up. So the only other factors that the court looked at under the Fourth Amendment claim were proximity to the border, which is everybody who goes through the checkpoint is going to be proximate to the border. So that's a factor that's really nonsense, and it wasn't a factor that was even cited by the agents. The agents cited the clothing. They cited – they cited the female drivers. They cited the sedans, and that's what the agents were looking at. Thank you, Your Honor. Thank you both. We'll take this case under advisement. Next case of the morning.